UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| LEO BRYNES TRUST d/b/a MANTON INDUSTRIES, BIG TOP FLEA MARKET, and HOWARD BRYNES, individually,<br><br>Plaintiffs,<br><br>v.<br><br>KEITH BRYNES, ATLANTIC ABATEMENT & CONSTRUCTION, INC., and ATLANTIC ABATEMENT CORPORATION<br><br>Defendants. | 19-cv-_____ |

**COMPLAINT**

INTRODUCTION

Plaintiffs Leo Brynes Trust d/b/a Manton Industries (the "Trust"), Big Top Flea Market, and Howard Brynes, individually and on behalf of the Trust (collectively, "Plaintiffs"), submit the following averments:

**PARTIES**[1]

1. Howard Brynes (or "Howard") is an individual residing in Boynton Beach, Florida. He is a Trustee of the Trust.

2. The Trust was established on November 16, 1965. The Trust operates the business known as Manton Industries ("Manton" or "Manton Industries"). Pursuant to the terms of the Trust, Howard Brynes exercises control over Manton. Manton is operated in offices located at

---

[1] Given that many of the individuals in this case are related and share a surname, where appropriate, first names will be used for clarity.

1

120 Manton Avenue, Providence, RI 02909 and in one of the buildings located thereon (the "Premises"). Title to the Premises was held in the name of the Trust and was recently transferred to a newly established limited liability company established by the Trust.

3. Big Top Flea Market ("Big Top") is a business also owned and operated by Howard Brynes. Big Top rents space from Manton Industries and operates a flea market at the Premises.

4. Atlantic Abatement & Construction, Inc. ("Atlantic" or "Atlantic Construction") is a corporation incorporated under the laws of the State of Nevada as of December 5, 2012 and its principal place of business, until June 2019, was located at the Premises. Atlantic primarily performs asbestos removal.

5. Keith Brynes (or "Keith") is Howard Brynes' son and, upon information and belief, is a principal and owner of Atlantic.

6. Atlantic Abatement Corporation ("Atlantic Abatement") is a corporation incorporated under the laws of the State of Nevada as of March 15, 2019 and upon information and belief, its principal place of business is 390 Sleepy Hollow Farm Road, Warwick, RI 02886.

## RELATED PARTIES

7. Mark Carlson ("Carlson") is an individual residing in Rhode Island and, upon information and belief, owns half of the shares of Atlantic and has served as its vice president.

8. Atlantic Insulation Corp. of New England, Inc. ("Atlantic Insulation") is a corporation incorporated under the laws of the State of Nevada as of May 31, 2007 and is owned by Carlson and Frances Dubuque. Atlantic Insulation has ceased operations but it's primary business was asbestos removal.

9. American Pride Insulation Co. ("American Pride"), is a corporation incorporated under the laws of the State of Nevada as of May 1, 2010 and is owned by Carlson and Frances Dubuque. American Pride is the successor entity to Atlantic Insulation and its primary business is asbestos removal.

## JURISDICTION

10. The Court has original jurisdiction over this matter pursuant 28 U.S.C. § 1331 and over the related common law and state law claims based on supplemental jurisdiction pursuant to 28 U.S.C. § 1367.

## VENUE

11. Venue is proper as the majority of the relevant transactions described herein occurred in the State of Rhode Island.

## FACTUAL ALLEGATIONS

### Keith Brynes' Relationship with Mark Carlson

12. Carlson met Keith in early 1999 at Butler Hospital in Providence, RI.

13. Upon information and belief, Carlson had been admitted as a patient to Butler.

14. At this point in time, Carlson had also admitted to embezzling money from his prior employer and later served a probationary sentence. Upon information and belief, Keith was aware of the cause of Carlson's hospitalization and the embezzlement charge.

15. Nevertheless, in April of 1999, Keith offered Carlson a job working for him at his then company, AACone Insulation, Inc., a mechanical insulation business located at the Premises.

16. On or about May 1, 1999, Carlson began his employment for Keith at AACone Insulation, Inc., as a bookkeeper and to assist in generating sales.

17. From the outset of the employment relationship, Keith also asked Carlson to perform personal tasks for him unrelated to the business.

18. For instance, Keith often asked Carlson to pick up Keith's children from school, to pay Keith's personal credit card bills, and to communicate with Keith's attorneys on Keith's behalf.

19. Although Keith was not physically present very often in the office at the Premises during an average workweek, he would routinely call Carlson several times per day with various requests, some business related and others purely personal to Keith. Keith also habitually called Carlson multiple times after work hours and on weekends.

20. During many of these calls, Keith would yell at Carlson, belittle him, and at times threaten Carlson.

21. On several occasions, Keith called Carlson without a specific business request and shouted at him for things unrelated to Carlson's areas of responsibility. For instance, Keith called Carlson, on one occasion, to yell at him regarding a flat tire that had occurred to Keith's car; on another occasion, to rant about a judicial decision in Keith's divorce proceedings; and at another time for not receiving Patriots football tickets when he wanted them.

22. On several occasions, Keith also discussed with third parties Carlson's medical treatment at Butler Hospital as well as Carlson's prior embezzlement case.

23. Upon information and belief, Carlson believed that Keith told third-parties this information as a way to embarrass, humiliate, and diminish Carlson.

24. On some occasions, Keith would call Carlson shortly after a shouting and/or threatening episode to apologize. However, Keith would then shortly resume his antagonistic and threatening behavior within hours of the apologetic phone call.

25. Upon information and belief, despite this verbal and mental abuse, Carlson continued to work for Keith because he felt he was financially dependent on Keith and that it was unlikely he could find employment elsewhere due to his past history.

26. Upon information and belief, Keith systematically and intentionally exploited Carlson's past criminal record and prior mental health issues for his own benefit.

27. By engaging in such conduct, Keith intimidated and took advantage of Carlson and thereby successfully maintained a position of authority and control over him.

28. Because of this relationship, Carlson acquiesced, on most occasions, to Keith's demands and instructions regarding personal and business matters.

**Carlson's Employment with Big Top Flea Market and Manton Industries**

29. Between 2006 and 2008, Howard Brynes had become familiar with Carlson and his work ethic and eventually hired Carlson to perform recordkeeping services for Manton Industries and Big Top in addition to his duties at AACone.

30. Ultimately, Carlson assumed significant responsibilities at Manton Industries and Big Top, which included accounting and bookkeeping, billing tenants, managing relationships with tenants and vendors, and various additional responsibilities related to Premises maintenance.

31. Although Carlson was not authorized by any document as a signatory for the bank accounts of Manton Industries or Big Top, Carlson had been given specific signing authority by Howard Brynes to sign checks on his behalf, especially when Howard was in Florida.

32. Carlson was paid by Manton Industries for the services he provided to both Manton Industries and Big Top.

**Evolution of Business Entities Located at the Premises**

33. In 2007, Keith determined that AACone Insulation, Inc. would cease operations.

34. On or about May of 2010, Atlantic Insulation also ceased operations, however, the bank account owned and maintained by Atlantic Insulation was never closed.  Manton and Big Top continued their usual business operations

35. In December of 2012, Carlson and Keith formed Atlantic (Abatement and Construction).

36. Since its inception, through June of 2019, Atlantic shared office space at the Premises with Manton Industries and Big Top.

37. Atlantic also maintained all of its business records at the Premises.

38. Despite Atlantic being formed by Keith and Carlson, an individual named Tomas Milar was initially listed as the President, Vice President, Treasurer and Secretary for Atlantic in Nevada corporate filings.  Upon information and belief, this was a fiction as Tomas Milar had, and has, no responsibility for, or connection with, the management of Atlantic.  The true principals of Atlantic were and are Carlson and Keith as evidenced by subsequent filings with the Office of the Rhode Island Secretary of State.

39. The corporate filings in the State of Rhode Island indicate that Keith is the president of Atlantic and Carlson is its vice president.

40. Upon information and belief, Carlson and Keith each owned fifty percent (50%) of Atlantic pursuant to an oral agreement.

41. Carlson was responsible for bookkeeping, accounting, and general administrative management at Atlantic and Keith was responsible for bidding jobs.

42. At all times relevant to this Complaint, Carlson was also responsible for managing the finances of Atlantic and had access to all bank accounts owned by Atlantic, Manton Industries, Big Top, American Pride, and Atlantic Insulation.

**Keith's Conspiracy with Carlson to Wrongfully Embezzle and Steal Funds from Atlantic**

43. At all relevant times, Keith conspired with, directed or caused Carlson to use various corporate funds for Keith's own personal use and benefit.

44. Specifically, Keith directed Carlson to purchase rare gold coins on his behalf from a company identified as Monaco Financial, LLC d/b/a Monaco Rare Coins ("Monaco") located in California.

45. Carlson informed Keith that Atlantic did not have sufficient funds to purchase these rare gold coins, but Keith insisted on the purchase and repeatedly demanded that Carlson purchase the coins with Atlantic money.

46. Between 2013 and 2018, approximately $928,300.29 was wrongfully taken from Atlantic to repeatedly fund the purchase of rare, gold coins from Monaco for Keith's personal benefit. See Affidavit of Frank Previti, attached hereto as Exhibit A.

47. In correspondence with Monaco, Atlantic is actually listed as the owner of these rare gold coins.

48. At all relevant times, Keith, and not Atlantic, has had possession of these gold coins.

49. Neither the purchase nor possession of these gold coins served any legitimate corporate business purpose for Atlantic.

50. Upon information and belief, Carlson made the transactions with Monaco both by wire transfer and by mailing checks.

51. Between 2013 and 2019, $161,698.32 was also taken from Atlantic accounts to pay Keith's personal credit card expenses. See id.

52. Atlantic had a credit card issued in its name that allowed it to be used by both Carlson and Keith for legitimate business purposes. However, Keith routinely used the Atlantic credit card to pay for his own personal expenses.

53. Carlson repeatedly advised Keith not to use Atlantic's credit card for his own personal expenses and that it was meant to be used only for Atlantic's legitimate business purposes.

54. However, Keith ignored these warnings and continued to use Atlantic's credit card to pay for his own personal debts and obligations.

55. In addition, Keith directed Carlson to use Atlantic funds to pay Keith's personal credit card bills as well.

56. Between at least 2013 and 2019, approximately $84,721.10 was diverted from Atlantic accounts to pay for Keith's own, personal expenses which included car payments to Acura Financial, Lexus Financial, and various bills for auto repairs. See id.

57. Atlantic does not own, nor did it ever own, any vehicles purchased through Acura or Lexus automobile dealers.

58. Rather, these vehicles were owned directly by Keith, titled in his name, and operated by Keith or members of his immediate family.

59. In addition, between 2016 and 2018, Keith directed Carlson to withdraw approximately $100,412.13, in cash, from Atlantic's account and to disguise that Keith was the actual recipient and/or beneficiary of the diverted funds. See id.

60. In one instance, Carlson withdrew $20,000, via a certified cashier's check, that was ultimately given to Keith's girlfriend—who had no connection to Atlantic—to purchase a Lexus.

61. Upon information and belief, Keith also did not want any direct evidence of transfers from Atlantic accounts to his personal bank account because he receives Social Security Disability Insurance payments and is therefore subject to certain employment and income limitations and reporting requirements by the Social Security Administration.

62. At the time of most of Keith's monetary requests, Atlantic did not have sufficient capital on hand to make these expenditures for Keith's personal benefit.

63. Keith knew or should have known that Atlantic did not have sufficient funds to satisfy all the expenditures that he demanded to be paid for his own benefit.

64. After its formation, Atlantic initially obtained some significant contracts from the U.S. Navy and other entities, however, Atlantic was only performing asbestos removal at personal residences within a few years after its incorporation.

65. Keith, who spoke to Carlson multiple times a day, was well aware that Atlantic did not have enough business income to satisfy the personal expenses he demanded to be paid by Atlantic.

66. When Keith told Carlson to purchase the rare, gold coins from Monaco, Carlson repeatedly informed him that Atlantic could not afford this expense.

67. At times, Carlson was able to delay the purchase of the gold coins by temporarily convincing Keith that it was an expense Atlantic could not then afford.

68. Ultimately, Keith was implacable in his demands to Carlson that Atlantic purchase the gold coins from Monaco.

**Wrongful Transfers from Manton Industries and Big Top Flea Market to Atlantic**

69. Keith knew that Carlson had access to other business accounts, including those controlled by Howard, that were unrelated to Atlantic.

70. Over several years, Keith had presented himself to third parties as the principal and/or owner of Big Top and Manton Industries.

71. He had also told employees and tenants of Big Top and Manton Industries that he would inherit the businesses, and that he was the de facto boss for those two entities.

72. Keith also told Carlson that he was named as a beneficiary under the trust that created Manton Industries when, in fact, he was not.

73. Although Keith had no ownership interest in American Pride, Keith also made clear to Carlson that any business American Pride developed was dependent on Keith and based upon Keith's business connections and his prior work for the predecessor entities to American Pride.

74. Under these circumstances, Keith directed Carlson to use his position as bookkeeper for various corporations, including Manton and Big Top, to take funds from these other businesses which were also headquartered at the Premises and transfer those funds to Atlantic when, in fact, those funds were used to benefit Keith personally.

75. Between at least 2013 and 2019, through a series of financial transactions, Carlson wrongfully transferred a total of approximately $438,500 from the Big Top account to an Atlantic account which funds were then primarily used for Keith's personal use and benefit.

76. Between 2013 and 2019, through a series of financial transactions, Carlson wrongfully transferred a total of approximately $235,850 from the Manton Industries account to an Atlantic account which funds were then primarily used for Keith's personal use and benefit.

77. In addition, between 2013 and 2019, through a series of financial transactions, Carlson used American Pride as a conduit to wrongfully transfer funds from Manton Industries and Big Top to Atlantic for Keith's personal use and benefit.

78. Upon information and belief, Carlson, under Keith's supervision and direction, wrongfully transferred additional funds, beyond those specified herein and for a longer period of time, to Atlantic from Big Top, Manton Industries, Atlantic Insulation and American Pride for Keith's personal use and benefit.

79. The above referenced financial transactions were accomplished based upon Keith's authority and control over Carlson.

80. These wrongful transactions occurred on a routine and consistent basis for several years. In 2017, for example, Keith caused Carlson to wrongfully transfer from Big Top to Atlantic the following amounts: $9,000 on February 10; $15,000 on February 17; $20,000 on May 16; $15,000 on August 13; and $7,500 on August 23.

81. In an attempt to disguise these wrongful transactions and as part of the conspiracy, Carlson later transferred some funds back into the accounts of Big Top and Manton Industries from Atlantic. However, Keith and Carlson never returned the full amounts of the wrongfully converted funds to these corporations and $255,500 still remains outstanding from Atlantic to Big Top and $235,850 remains unpaid by Atlantic to Manton Industries. See id.

82. Upon information and belief, Atlantic usually had sufficient funds to cover legitimate expenses related to its asbestos removal business. The additional funds that were wrongfully taken from Big Top and Manton Industries and then transferred to Atlantic were intended to be used primarily to pay Keith's personal expenses and were unrelated to Atlantic's normal business expenses.

83. In essence, Keith conspired with Carlson to use Atlantic as a conduit to wrongfully convert money from Big Top and Manton Industries to benefit himself, personally.

84. A total of approximately $478,350 was wrongfully diverted from Big Top and Manton Industries directly to Atlantic, an otherwise solvent business, to pay the personal expenses of Keith and was not a mere commingling of funds among related family owned businesses. See id.

85. An additional $254,425 was also wrongfully transferred from Manton Industries and Big Top and then funneled to Atlantic through American Pride. See id.

86. Upon information and belief, in addition to the transfers to Atlantic and American Pride, Keith directed, supervised, and/or caused Carlson to make these wrongful money transactions from Big Top and Manton Industries to benefit Keith personally.

87. Upon information and belief, Keith directed, supervised, and/or caused Carlson to use Manton Industries' account to pay approximately $34,992.81 in credit card bills for a Home Depot credit card account directly benefitting Keith; $23,000 to Citizen's Bank for a loan related to Keith's residence in Warwick; and $28,663 in fees for Keith's personal legal matters.

88. Howard, a Florida resident, would occasionally call Carlson from his home in Florida to check on the business performance and liquidity of Manton Industries and Big Top.

89. In many of his responses to Howard, Carlson would materially misrepresent the financial status of Manton Industries and Big Top as part of the conspiracy with Keith.

90. Keith knew, or had cause to know, that Carlson communicated with Howard by phone on a regular basis regarding Howard's businesses and that Carlson would not advise Howard of these wrongful financial transactions and would misrepresent the financial status of Manton and Big Top to Howard.

91. While Howard Brynes, on occasion, knowingly wrote checks from Big Top and Manton Industries to Atlantic, he did not know of, or authorize, the vast majority of withdrawals of funds from Big Top and Manton Industries that were funneled to Atlantic for the payment of Keith's personal expenses as described herein.

92. Indeed, Keith has no ownership rights or interest in either Big Top or Manton Industries.

93. During most of this relevant time period, upon information and belief, Keith was collecting Social Security Disability payments from the Social Security Administration by claiming that he was disabled from work.

94. It is not known, at this time, whether Keith notified the Social Security Administration of his receipt of these wrongfully diverted funds or whether he declared the funds he received and used as income on his annual tax returns.

95. In March of 2019, Howard Brynes was told by Mark Carlson of the wrongful diversion of funds from Big Top and Manton Industries to Atlantic and eventually to Keith. Upon learning of these wrongful and larcenous acts, Howard ordered Keith to cease his business operations at the Premises.

96. Upon information and belief, in March of 2019, Atlantic sought to sever ties with Carlson, however, it is not known whether Atlantic's efforts were legally sufficient.

97. On March 15, 2019, Atlantic Abatement Corporation was formed by Keith and his children, Alexa and Jared, and its business is not operated at the Premises.

98. Since June of 2019, Atlantic no longer operates at the Premises.

## COUNT I

### 18 U.S.C. § 1964(c)
### (Civil RICO)

99. Plaintiffs incorporate the allegations contained in Paragraphs 1 through 98 herein in the same length and detail.

100. Keith used his position as Carlson's boss and supervisor to conspire with and direct Carlson to, in fact, wrongfully divert funds from Big Top and Manton Industries to Atlantic.

101. Atlantic was utilized as an enterprise to wrongfully divert several hundred thousand dollars from Howard's businesses to be used for Keith's own personal use and benefit.

102. Keith, in conjunction with Carlson, also utilized Manton Industries and Big Top, as enterprises to wrongfully steal and embezzle funds from those enterprises to Atlantic to then be used for Keith's personal benefit.

103. Keith knowingly used Atlantic, as an enterprise, to cleanse the taint from the wrongfully diverted funds taken from Manton and Big Top.

104. By funneling Big Top and Manton money to Atlantic, which was then utilized by Keith for his own personal benefit, Keith was, in whole or in part, concealing and disguising the nature, location, source, ownership and control of those unlawfully obtained funds.

105. Atlantic was engaged in interstate commerce through its usual business and, more specifically, in the wrongful transfer of funds by use of a federally insured national bank and the further wrongful use of those funds in the stream of commerce.

106. Keith was the principal driver and beneficiary of using these enterprises to defraud Big Top Flea Market and Manton Industries.

107. By exploiting his supervisory relationship with Carlson, Keith directed and/or supervised Carlson's conduct in funneling funds out of Big Top and Manton Industries accounts

4841-8120-2855, v. 1

to Atlantic, on the basis that he had hired Carlson, that he claimed to be the de facto owner of those accounts, and that he further claimed that he would ultimately inherit these businesses.

108. Keith never advised Howard until fairly recently of the nature of these aforementioned transactions and that Manton Industries and Big Top monies were being wrongfully transferred to Atlantic.

109. Keith was the primary recipient of the tainted funds wrongfully transferred out of Big Top and Manton Industries' accounts to Atlantic.

110. Keith knowingly conspired with and directed Carlson to wrongfully convert Big Top and Manton Industries' funds by wrongfully and continuously transferring money out of Manton Industries and Big Top accounts to Atlantic from at least 2013 to 2019.

111. At least some of the transactions were accomplished by transferring funds, online, between business accounts.

112. In furtherance of the scheme, Carlson used interstate telephone calls with Howard and deceived Howard during these calls regarding the financial status of Manton Industries and Big Top and the diversion of corporate funds to Atlantic.

113. Keith directed and approved Carlson's use of the wrongfully transferred funds from Manton Industries and Big Top Flea Market accounts to Atlantic to ultimately pay for expenses and benefits personal to Keith, including the $928,300.29 that was used to acquire rare, gold coins from Monaco.

114. Carlson, with Keith's knowledge, transferred funds to Monaco via wire and/or the U.S. mails to pay for the gold coins.

115. The fraudulent transfers from Manton Industries and Big Top occurred repeatedly between at least 2013 and 2019.

4841-8120-2855, v. 1

116. In order to accomplish this conversion of funds, Keith used an enterprise, Atlantic, to engage in a pattern of racketeering, to wit, wire fraud (in violation of 18 U.S.C. §1343) and mail fraud (in violation of 128 U.S.C. § 1341), and concealed and/or disguised these fraudulent transfers by laundering those funds to Atlantic to be utilized for Keith's own personal benefit in violation of 18 U.S.C. § 1956 et. al.

WHEREFORE, Plaintiffs have been damaged by this wrongful conduct and theft and are entitled, upon their proof, to treble damages, reasonable attorneys' fees, and costs pursuant to 28 U.S.C. § 1964.

## COUNT II

### Action under R.I. Gen. Laws § 7-15-4
### (State Civil RICO)

117. Plaintiff incorporates the allegations contained in Paragraphs 1 through 116 herein as if stated herein in the same length and detail.

118. Carlson had access to Big Top and Manton Industries' bank accounts by virtue of his employment.

119. Keith knew Carlson had such access and exploited his superior relationship with Carlson and directed Carlson to transfer funds from Big Top and Manton Industries to Atlantic with the ultimate purpose of using the diverted funds to pay his own personal expenses and for his own benefit.

120. Keith intended that Carlson wrongfully transfer funds from Big Top and Manton Industries to Atlantic with the ultimate purpose of paying for Keith's own personal expenses and for his benefit.

121. Keith conspired with Carlson to steal, embezzle and/or convert funds and successfully stole, embezzled and/or converted funds from Big Top Flea Market and Manton

4841-8120-2855, v. 1

Industries by use of an enterprise, to wit, Atlantic, all in violation of Rhode Island law and R.I. Gen. Laws § 11-41-3 and § 7-15-4.

WHEREFORE, Plaintiffs have been damaged by this wrongful conduct and thefts and are entitled, upon their proof, to treble damages, costs, and reasonable attorneys' fees pursuant to R.I. Gen. Laws § 7-15-4.

## COUNT III

### Civil Liability for Crimes, R.I. Gen. Laws § 9-1-2

122. Plaintiff incorporates the allegations contained in Paragraphs 1 through 121 herein, in the same length and detail.

123. Carlson had access to Big Top and Manton Industries' bank accounts by virtue of his employment.

124. Keith was aware of Carlson's access and exploited his superior relationship with Carlson and directed Carlson to wrongfully transfer funds from Big Top and Manton Industries to Atlantic with the ultimate purpose of paying his own expenses and for his own benefit.

125. Keith intended and conspired with Carlson to wrongfully transfer funds from Big Top and Manton Industries to Atlantic with the ultimate purpose of paying his own personal expenses and for his own benefit, to the detriment of the Plaintiffs.

126. Keith conspired with Carlson and utilized Atlantic to embezzle, steal and/or convert funds and successfully embezzled, stole and/or converted funds from Big Top and Manton Industries in violation of Rhode Island criminal laws and specifically, but not limited to, R.I. Gen. Laws § 11-41-3 and § 7-15-4.

WHEREFORE, Plaintiffs have suffered substantial damages from this wrongful theft, embezzlement and/or conversion of their funds and are entitled, upon their proof, to treble damages under R.I. Gen. Laws § 9-1-2.

## COUNT IV

### (Fraud)

127. Plaintiff incorporates the allegations contained in Paragraphs 1 through 126 herein in the same length and detail.

128. Carlson, based on his employment with Big Top and Manton Industries, served in a position of trust and confidence to those entities and their principals.

129. Based on direction and approval from Keith, Carlson used his position to wrongfully transfer funds from Big Top and Manton Industries to Atlantic with the knowledge that these funds would ultimately be used to benefit Keith personally.

130. Carlson regularly made misleading representations regarding the financial status of Big Top and Manton Industries and their bank accounts to Howard Brynes.

131. Keith never told or advised his father, Howard, that he was diverting Big Top and Manton Industries funds for his own personal use and benefit.

132. Keith and Carlson intended that Howard Brynes rely upon Carlson's representations so they could continue to wrongfully transfer funds from Big Top Flea Market and Manton Industries to Atlantic, which were ultimately utilized for Keith's own personal benefit.

133. Howard Brynes reasonably relied on Carlson's representations and Keith's silence to his detriment.

134. Howard, the Trust, Big Top Flea Market and Manton Industries, together, were defrauded of at least $732,775 that was wrongfully diverted and transferred to Atlantic and, in turn then wrongfully taken for the personal benefit of Keith.

135. Upon information and belief, additional funds, whose number is currently unknown, were taken directly from Manton Industries and Big Top for Keith's personal benefit.

136. Big Top and Manton Industries have suffered significant damages based upon Keith's fraudulent conduct.

WHEREFORE, Plaintiffs respectfully pray for monetary relief, for compensatory damages, and statutory damages and further pray for an award of interest, costs, and reasonable attorneys' fees and any such additional and further relief as this Honorable Court deems just under the circumstances.

LEO BRYNES TRUST d/b/a MANTON INDUSTRIES, BIG TOP FLEA MARKET, and HOWARD BRYNES,

By their attorneys,

PANNONE LOPES DEVEREAUX & O'GARA LLC

/s/ William P. Devereaux
William P. Devereaux (#2241)
Joshua J. Butera (#9757)
PANNONE LOPES DEVEREAUX & O'GARA LLC
1301 Atwood Avenue, Suite 215N
Johnston, RI  02919
(401) 824-5100 (telephone)
(401) 824-5123 (facsimile)

Dated: September 26, 2019

4841-8120-2855, v. 1